# LEDERER v. WALKER.

PATENTS; BURDEN OF PROOF; LACHES.

1. No advantage, so far as the burden of proof is concerned, accrues to
the senior applicant, by the issue of a patent to him at a time when
the application of the junior party is pending.

2. Delay for four years in applying for a patent for a process for the
manufacture of solutions suitable as lacquers or varnishes will
not subordinate the first inventor's right to one who in the meantime
has applied for a patent for the same invention, where the first in-
ventor's application was not stimulated by knowledge of the subse-
quent invention, and his delay was largely due to the difficulty of
obtaining an ingredient requisite as a solvent, in quantities suffi-
cient for commercial use.    (Citing *Esty* v. *Newton*, 14 App. D. C.
50, distinguishing *Re Mower*, 15 App. D. C. 144; *Thomson* v. *Weston*,
19 App. D. C. 373; *Matthes* v. *Burt*, 24 App. D. C. 265; *Dieckmann*
v. *Brune*, 37 App. D. C. 399.  Limiting *Mason* v. *Hepburn*, 13 App.
D. C. 86.)

No. 769.  Patent Appeals.  Submitted May 14, 1912.  Decided May 30,
1912.

HEARING on an appeal from a decision of the Commissioner
of Patents in an interference case.            *Affirmed.*

The facts are stated in the opinion.

*Mr. Eugene A. Byrnes, Mr. John H. Brickenstein,* and *Mr.
Adolph M. Delmas* for the appellant.

*Mr. Frederick P. Fish* and *Mr. Guy Cunningham* for the
appellee.

Mr. Chief Justice Shepard delivered the opinion of the Court:

This is an appeal from a decision of the Commissioner of Patents in an interference proceeding, awarding priority to the claim of William H. Walker to the invention embraced in the following issue:

"1. The process for the manufacture of solutions suitable as lacquers or varnishes and for other industrial purposes, which consists in dissolving a suitable organic compound in acetylene terra-chlorid, substantially as described.

"2. The process for the manufacture of solutions suitable as lacquers or varnishes and for other industrial purposes, which consists in dissolving suitable organic compounds in acetylene tetra-chlorid and another solvent of the said compound, substantially as described.

"3. The process for the manufacture of solutions suitable as lacquers or varnishes and for other industrial purposes, which consists in dissolving an acidulized cellulose in acetylene, tetra-chlorid, substantially as described.

"4. The process for the manufacture of solutions suitable as lacquers or varnishes and for other industrial purposes, which consists in dissolving acetyl cellulose in acetylene tetrachlorid, substantially as described.

"5. A composition of matter consisting of a solution of acidulized cellulose in acetylene tetra-chlorid, substantially as described.

"6. A composition of matter consisting of a solution of acidulized-cellulose in acetylene tetra-chlorid and another solvent, substantially as described.

"7. A composition of matter consisting of a solution of acetyl cellulose in acetylene tetra-chlorid, substantially as described.

"8. A composition of matter consisting of a solution of acetyl cellutose in acetylene tetra-chlorid and another solvent, substantially as described."

As stated by the appellant, the first five counts of the foregoing issue embody the idea of the solution of cellulose acetate

in acetylene tetra-chlorid; the last three counts, the idea of the solution of cellulose acetate in acetylene tetra-chlorid and another solvent.

It is conceded, as found by the tribunals of the Office, all of which concurred in awarding priority to Walker, that he discovered the invention of the issue in October, 1901; and that he reduced the same to practice between October, 1901, and May, 1902. Lederer, a resident of Germany, filed his application April 10, 1905. Walker filed October 23, 1905. A patent issued to Lederer November 21, 1905; but as Walker's application was then pending, no advantage accrues to Lederer thereby, so far as the burden of proof is concerned. Lederer was the last to conceive and reduce to practice, but the first to enter the Patent Office. The reduction to practice by Walker consisted in trying the solvents and testing their efficiency. No commercial use was made. It will be perceived that about four years elapsed between this test and the filing of his application. The appellant has conceded the facts, and bases his contention of error on Walker's delay. He relies on the following assignment of error: "The Commissioner erred in not holding that Walker was barred by his own laches from applying for a patent as against Lederer, a subsequent independent inventor, who had made his invention in good faith, without knowledge or notice of Walker's prior invention or claim."

His contention is thus stated: "We contend that the claim of a first inventor for a patent is lost by his unreasonable neglect after he has reduced his invention to practice, to apply for a patent." "Our contention," he further says, "is that neither an actual intention to abandon, nor other statutory bar, is an essential or indispensable element to the postponement of the first inventor's claim of priority, and that such postponement may be based upon the sole ground of negligence in applying for a patent. The doctrine upon which we rely is based neither upon the idea of abandonment, nor upon that of immoral intent. Laches constitutes its sole foundation."

This clear and candid statement of their position by counsel for the appellant, which has been maintained before every

tribunal of the Patent Office, eliminates any question of actual abandonment of the invention by the appellee, or of an intent to conceal or suppress knowledge of it.

Counsel cite many decisions in support of their contention. Some of these, relating to laches in making actual or constructive reduction to practice after the complete conception of an invention, have no bearing on this controversy, because reduction had been made before the independent, rival inventor entered the field. Many of the other cases cited are reviewed in *Mason* v. *Hepburn,* 13 App. D. C. 86, on which reliance is had. *Mason* v. *Hepburn* was a case of deliberate secretion of an invention after its reduction to practice, for about seven years, during which interval another, without knowledge of the work of the first inventor, conceived the same invention, and procured a patent for it. The first inventor was stirred to activity by the knowledge of the latter's patent. It was held that the first inventor had lost his right. · In an opinion reviewing the previous decisions bearing on the principle involved, it was said (p. 95): "Considering, then, this paramount interest of the public in its bearing upon the question as presented here, we think it imperatively demands that a subsequent inventor of a new and useful manufacture or improvement, who has diligently pursued his labors to the procurement of a patent in good faith, and without any knowledge of the preceding discoveries of another, shall, as against that other, who has deliberately concealed the knowledge of his invention from the public, be regarded as the real inventor, and as such entitled to his reward." This has become the settled doctrine of this court. *Re Mower,* 15 App. D. C. 144–154; *Thomson* v. *Weston,* 19 App. D. C. 373–379; *Matlhes* v. *Burt,* 24 App. D. C. 255–270; *Dieckmann* v. *Brune,* 37 App. D. C. 399–408. See also *Curtain Supply Co.* v. *National Lock Washer Co.* 174 Fed. 45–47. In each of those cases there was a deliberate suppression of the invention for different periods, during which another independent inventor entered the field, and, reducing the invention diligently to practice, introduced it to the trade. The first inventor was in each instance stirred to activity by the knowledge of his

rival's successful exploitation of the invention. In other cases, the doctrine is approved, though not essential to the particular decision. *Warner* v. *Smith,* 13 App. D. C. 111; *Howard* v. *Bowes,* 31 App. D. C. 619–625.

None of the cases cited support the doctrine that mere delay in applying for a patent, after actual reduction to practice, will necessarily subordinate the first inventor's right to one who, in the meantime, has applied for a patent for the same invention, though it may be a potent circumstance in determining whether the alleged reduction to practice had, in fact, been made. The right of the first inventor who has actually reduced to practice has always been respected where there is no doubt of actual reduction to practice, and consideration has always been given to the circumstances excusing the delay. *Esty* v. *Newton,* 14 App. D. C. 50–54. In that case it was held that the circumstances of the delay did not bring it within the operation of the principle governing *Mason* v. *Hepburn,* supra. It was said (p. 54): "By actual reduction to practice, the right to the invention becomes perfect, and can only become subordinate to the claim of a subsequent bona fide inventor by some such course of conduct as that shown in *Mason* v. *Hepburn,* supra, and cases therein cited. The importance of mere delay whilst the inventor is engaged in the prosecution of other improvements in the same art is in its weight more or less great, according to the explanatory circumstances in determining whether the attempted reduction to practice of the device amounted to an actual demonstration of its practical efficacy and utility, or fell short thereof, and rendered it nothing more than an abandoned experiment."

Later, apprehending that there was a disposition to give the doctrine of *Mason* v. *Hepburn* a wider scope than was justified, the court took occasion to say that the rule of that case "will not be extended to any case not coming clearly within it." *McBerty* v. *Cook,* 16 App. D. C. 133–139. See also *Oliver* v. *Felbel,* 20 App. D. C. 255–262. In *Oliver* v. *Felbel,* Mr. Justice Morris further explained the limitation of the doctrine as follows: "The diligence required of an inventor is diligence rather in the reduction of his invention to practice than in ap-

plication to the Patent Office, or in manufacturing his device for public use. It is very true, as we held in *Mason* v. *Hepburn, Warner* v. *Smith,* and other cases, that delay long and unexplained, and yielding to activity only when the knowledge comes of the entrance of a rival on the field, is always presumptive evidence that what is claimed to have been reduction to practice was no more in fact than an unsatisfactory or abandoned experiment. But when reduction to practice has been satisfactorily shown, and there is no unreasonable or unexplained delay, there is no law that would bar the first or original inventor of his right. In order to give to delay the effect of destroying such a right, there must be some circumstance of concealment, suppression, or abandonment of the invention." To the same effect, see *Rolfe* v. *Hoffman,* 26 App. D. C. 336–341; *Burson* v. *Vogel,* 29 App. D. C. 388–395; *Rolfe* v. *Kaisling,* 32 App. D. C. 582–588. In the last-named case, Leeper, to whom priority was awarded, conceived the invention, and undoubtedly reduced it to practice; but he waited four years before applying for a patent. Under the explanatory circumstances, the delay was held no bar. Having found the facts concerning the earlier conception of Leeper and his reduction to practice, Mr. Justice Robb, who delivered the opinion of the court, said: "There is no controversy regarding the date to which Leeper is entitled, which is earlier than the earliest date even claimed by Rolfe. It is, however, contended that Leeper, by his long delay in filing his application, is estopped to set up his rights against those of Rolfe, who was diligent both in respect to reduction to practice and in applying for a patent. It is true that Leeper's application was not filed until May 28, 1904. It is also true that he did not conceal or abandon his invention. The evidence shows quite the contrary. He appears to have realized its value, to have discussed it freely with others, and to have endeavored to interest men of means to exploit it. We do not think the evidence brings the case within the doctrine enunciated in *Mason* v. *Hepburn,* supra, and *Warner* v. *Smith,* 13 App. D. C. 111, but rather under the rule announced in *Rolfe* v. *Hoffman,* 26 App. D. C. 336–341."

The foregoing review shows that the principle governing *Mason* v. *Hepburn,* and cases following it, applies where the facts and circumstances of inaction show an intention to abandon, suppress, or conceal the knowledge of the invention, until notice of the entry of a subsequent inventor on the unoccupied field induces activity; and that mere delay, not induced by such facts and circumstances, may be explained and accounted for in accordance with the general principles governing the equitable doctrine of laches. It remains to consider the evidence of Walker explanatory of his delay, and apply thereto the principles of law that have been declared.

As we have seen, it is admitted that there was no intention on the part of Walker either to abandon his invention after testing its efficacy, or to conceal it from the knowledge of the public. The charge against him is that he slept upon his rights for about four years, and thus, by his failure to apply for a patent during that time, he has forfeited his right to the later inventor.

The later inventor, who in his laboratory in Germany had made the same discovery and tested it as Walker had done, had not made commercial use of the invention; nor had he obtained a patent for it prior to the filing of Walker's application. Walker had no knowledge of Lederer's discovery, and was not roused to action thereby. Lederer's application for the patent was not known to him, because of the rule of secrecy that governs Patent Office procedure in such matters.

Coming now to the facts relating to Walker's discovery of the solvent, his test of the same, and the excuses for his delay in applying for a patent, it appears that he was a learned and skilful chemist. He had been an instructor in chemistry in a Pennsylvania College and in the Boston Institute of Technology; later was professor of industrial chemistry in the latter institution. In 1901, he entered into partnership with Arthur D. Little, who was also a skilled chemist, with reputation for his work in cellulose and its derivations, to engage in analytical, consulting, and research work in chemistry. Cellulose nitrate had long been in use with well-known solvents, but there

was a lack of practical solvents for cellulose acetate. Chloroform and phenal had been used as solvents, but their use commercially was attended with serious practical disadvantages. Being interested in the development of the uses of cellulose acetate, Walker was energetic in his efforts to discover an additional solvent that could be utilized. In the course of those efforts he conceived the idea that acetylene tetra-chlorid would accomplish the purpose. This compound was little known. It had never been produced in the United States, and in Europe only as a laboratory experiment. It could not be obtained in the market at the time of his conception of its availability as an efficient solvent. Being too busy at the time of his conception of the idea, in October, 1901, to undertake the protection of the acetylene tetra-chlorid, he employed Professor Morris to produce a small quantity in the laboratory. The latter, by a method described by a French chemist, Mouneyrat, succeeded in producing a very small quantity. Walker and Norris found this sufficient to test the solubility of cellulose acetate therein. They found that it dissolved readily, and also in various by-products formed during the process of making the acetylene tetra-chlorid. This was a reduction to practice of some of the counts of the issue. Later experiments reduced to practice the remaining counts, in May, 1902. The invention was then complete. Walker communicated it to Little, and obtained a written report from Professor Norris fully explaining the entire process from the production of the acetylene tetra-chlorid to the final test of the solution. During 1902, Walker disclosed his invention to Mr. Callan, of the General Electric Company, and to Mr. Buchanan, head of the experimental chemical laboratory of Stone & Webster, who was then engaged in the manufacture of chlorin substitution products of methane, such as carbon tetra-chlorid and chloroform. There was no injunction of secrecy concerning the disclosure. As the acetylene tetra-chlorid could not be procured for commercial use, Walker, with the aid of competent assistants, set about methods of producing the same. The attempts were attended with serious and dangerous explosions. Sufficient quantities of the compound were made

during 1902 to thoroughly test the efficacy of the solution. Films were made and preserved. But the process was too dangerous and expensive to obtain the new solvent for commercial use. An experiment made in December, 1902, was attended with a very damaging explosion. Walker went to Europe in the spring of 1903, part of his purpose being to investigate the different processes which might be useful for the manufacture of chemicals useful in the preparation and handling of cellulose acetate. The making of artificial silk seems to have been one of his chief objects of investigation. In August, 1903, he and his associate chemists heard that Dr. Askenasy, of Nuremberg, Germany, had a process for manufacturing acetylene tetrachlorid on a commercial scale that he was working to begin. Walker wrote to Askenasy in October, 1903, requesting the price in lots of 2,000 pounds. It was not until in a letter of February 24, 1904 that Askenasy replied stating that he had at last completed his works, and quoting price. March 8, 1904, Walker wrote Askenasy ordering 50 kilos of acetylene tetrachlorid. Askenasy replied, April 7, 1904, that he would make the shipment of the order in about fourteen days. Not receiving notice of the shipment, Walker wrote, on May 24, 1904, making inquiry. June 8, Askenasy wrote, saying it was impossible to ship until the following week, and excused his delay. The shipment was finally received in September, 1904. Solutions were made, and in December a mixture of solvent was sent to the General Electric Company. Samples of the solutions and films were sent to France in January, 1905. Before going abroad in June, 1905, Walker prepared a draft of a specification for an application for patent. It was not in shape for execution and filing. It was worked on during Walker's absence, by Little and Mork. It was executed by Walker after his return, and filed October 23, 1905.

As Walker's application was not stimulated by knowledge of Lederer's subsequent invention, we are of the opinion that his delay in making the same, under all the facts and circumstances stated, was not so inexcusable as to estop him from claiming the reward of his earlier invention. The situation is quite similar

D. C.]                              Syllabus.

to that disclosed in *Rolfe* v. *Kaisling,* 32 App. D. C. 582–588, in which the claim of the earlier inventor was sustained.

Perceiving no error in the decision appealed from, it will be affirmed. It is so ordered, and the Clerk will certify this decision to the Commissioner of Patents. *Affirmed.*